? Good morning. Good morning, your honors. Cheryl Lianza, and I would like to reserve four minutes for rebuttal. Very well. For 35 years, local franchise authorities and cable operators have negotiated local franchise agreements which provide institutional networks and discounted services to elementary school children, senior citizens, networks for police and fire departments, court systems, boards of election, and more. The FCC's order under review turns inside out the Cable Act under which these agreements have been negotiated. This leaves LFAs in an impossible situation, having to either give up these important facilities and services or pay for something for which they've already bargained. We have met the task for a stay pending appellate review, and I'd like to start with our success on the merits and then move to irreparable harm. One of the easiest ways to think about the FCC's error, and I should start by saying what the FCC decided in this case, was to apply cable-related franchise requirements against the 5% franchise fee limit in the act. And that seems to be the only thing that you're challenging in the order. In other words, I don't see that you've tried to make any showing that their mixed-use rule should be stayed or that their preemption conclusions should be stayed. Do you? Well, we do believe that the entire order should be stayed. But you haven't made any showing as to those things. But not on those grounds, right? Not on those grounds? On which grounds? On those bases. The ones I just said. Oh, yes. Well, for example, Your Honor, the order is very interrelated with one another. So the FCC preempts all state and local government authority that they find are not already authorized by the act. So we need to know what the act means, and this in kind is part of what the act means. Similarly, they apply their rulings to state franchises. We need to know what their order means in order to know what state franchises have to do. And in addition, Your Honor, one of the key facts with regard to this case is the FCC anticipates that we would have negotiations between cable operators and local governments to try to determine how to implement the FCC's order. Well, I mean, you all haven't exactly been blindsided by this rule. I mean, they came out with this rule basically 13 years ago. And then we looked at it three years ago or two and a half years ago. We didn't say it was wrong. We just said they hadn't explained certain aspects of their interpretation and remanded it for them to do that. So you've known that this is coming, and I understand your argument about hardship. But at the same time, this can hardly be a surprise to the folks in your situation. Well, Your Honor, we never know what the FCC is going to do until it actually does it. So there were even some changes. They've been pretty consistent since 2007. Well, I think when you're talking about governmental entities, we've got the state of Hawaii. We've got local governments throughout the country. They can't really make plans until they know what the law is. So as to in-kind cable-related services being treated as a franchise fee, what specifically are you saying they got wrong in the short time that we have? Sure, absolutely. So, Your Honors, I think one is very important is that in the Montgomery County case that Your Honors issued, you found, and I quote, that the term franchise fee can include non-cash exactions. It does not mean that it necessarily does. Right. In-kind, I think it said there. It can include non-cash exactions. All right. But anyway, the point is that the FCC really hasn't gone any further than where they had gone the last time around. I would disagree. I think they've, I mean, just to put my cards on the table or be candid with you, I think they have come back with a quite thoughtful answer in this order that speaks directly to the concerns that we raise. So the idea that they just, you know, haven't explained their interpretation, I think you're going to have a hard time speaking for myself with that. You might just want to say here's where their reasoning goes astray. I mean, there's plenty of reasoning here, so where do they have a misstep? Absolutely. So where their reasoning goes astray, Your Honor, is that their first explanation for why the cable-related franchise requirements count against the cap is that they see no difference between cable-related requirements and non-cable requirements. This is the Cable Act. It's centrally concerned with cable systems, cable service. Wait a minute. What do you mean by no difference between those two things? That's what the commission finds. Right. And the main reason why the original finding with regard to non-cable requirements can be expanded to cable-related. Right. But they point out that the exceptions to the definition of franchise fee include two different kinds of cable service costs. Right. And there would have been no reason for Congress to exclude those had those cable-related costs not otherwise been part of the franchise fee definition. That's just sort of statutory interpretation 101. So what's wrong with that? Well, with respect, Your Honor, I would disagree. I believe that those provisions actually very clearly change the treatment of how the support for PEG services are treated. So Congress said, I want to make sure that we're focusing on the structure of the franchise fee definition itself. So the franchise fee definition has exceptions, but those exceptions were designed to allow local governments to impose additional fees on cable operators. It says you may charge a 5 percent fee and you may also charge these things. Now, one thing that Congress did do in those two provisions you're describing is change. But if those things weren't part of what counts towards a 5 percent fee in the first place, why would they have to accept those things out of the 5 percent fee? Congress usually doesn't waste its time in that manner. Correct.  Your Honor, that's really not an answer to the point about the rules of statutory construction. One of the good things about having courts interpret statutes is everyone knows the rules going in. We're not doing it based on a policy objective. We're doing it based on rules that you all can know and people can form their conduct around. Here, they've applied one of those rules. On that one, I'm having a hard time. It seems like the clear inference is that in-kind cable-related services can be franchise fees. And now you sort of have to say, okay, well, maybe this one or that one shouldn't be a franchise fee for a particular reason. They've actually beat you to that to some extent. So I guess what specific costs, in-kind cable-related costs, do you think should not count towards the franchise fee, that they are counting towards it? Well, Your Honor, I guess I would answer your question this way, which is to look at Section 546 of the Act, which was the key engines where local franchise authorities are assigned by Congress their obligation to negotiate these franchises. The LFA is required to conduct a process with regard to local cable-related needs and interests. Then the operator offers a proposal. Then the local franchise authority must do another process with regard to four points, one of which is local cable-related needs and interests. There must be a written decision. Cable operators are protected in order to provide evidence. Judicial review is, once again, engaged with local cable-related needs and interests. If we have this entire process put together in the Cable Act, why do we need that if all local government is doing is just purchasing services from the cable operator? Why do you need findings? Why do you need a standard? Why do you need cable operators providing evidence with regard to local cable-related needs and interests if the local government is just purchasing these products? I'm not trying to hold you to something here, but you didn't make any argument in your brief as to this. Absolutely we did, Your Honor. You did? Okay. Maybe I just forgot about it. So the essence of your argument is that the renewal sections then inform what the definition, the original definition is in the beginning of the Act? Yeah, well, because the entire Act works as a whole, and one thing I did want to highlight for Your Honors is the quote from Alliance in terms of facially ambiguous provisions can have their meanings clarified and rendered unambiguous by reference to the statute's structure. Right. So the Cable Act's structure designates local franchise authorities with significant rights and obligations with regard to local cable-related needs and interests. The reason it's in the renewal provision is in 1984 most local governments already had franchises, so Congress was stepping in and providing some changes for how those local franchises should go forward, but this is the key substantive section, and to have the franchise fee definition completely override the entire substantive section under which LFAs operate seems inconsistent. How does it override it? Because now instead of having an Act where local needs and interests are a primary focus and goal, which is also, I should say, enumerated in the purposes of the Act, now it's just can you afford to pay for it? Why did we need congressional legislation at all if the only answer is can the local government pay for something? Like that's something that we already know as it is. We didn't need the 1984 Cable Act to tell us that question, so the Cable Act must have been trying to do something else. And one thing I also wanted to explain is that I think... Wait there for just a second. So your argument is that in this renewal section then you're analyzing the ability of the municipality to pay for it or the cost to the franchisee to provide it? So in 546, the local government, first in 546A, has to make a finding about what the cable-related needs and interests of the community are. And then later, when there's a four-part test to determine whether the operator has met the needs of the community, letter D there in that four-part test is whether it meets the cable-related needs and interests, taking into account cost. So, first of all, we have this complex process. I'm just asking cost to whom? Oh, cost. You mean in that D? It's the cable operator's cost. All right. Thank you, because for some reason I wasn't following your argument. I was thinking you were saying the cost of or the ability of the municipality to pay for it. That's not what you meant. No. I mean, unfortunately... No is fine. Okay. I was going to say FCC's argument makes it be the only question is whether the local government authority can pay for it. I do see I've run out of time. I was going to turn to irreparable harm. I'll give you a couple minutes. Okay. I just wanted to quickly explain, Your Honors, two things. In particular, right now, local governments around the country are making contingency plans. They are under severe budget uncertainty. For example, City of New York, State of Hawaii are trying to figure out how to handle the coronavirus. One of the key things that governments do and everybody does is to require telecommuting. How can you require telecommuting if you don't know that your institutional network is going to be available to you? These institutional networks are essential services. And we have shown in the declarations that these are essential for core operations of government and that unlike the FCC's conclusion in its state denial order at paragraph 17, it is not a simple matter to just buy them or replace them. Is anybody threatening to cut them off? Right now, Your Honor, the cable industry has not done that, but we do expect it is very likely if Your Honors deny the state that we will see those requests. The entire premise of this... I mean, you know, like they're going to cut off the INET for New York City? Is there really something in the record that says that's a reality? Well, Your Honors, the cable industry has been... Is that a speculation? No, they've been asking for this seriously. Even when the FCC denied our stay, went back and said, no, we need to be sure that it's very clear that we can continue to go on. We need to be sure it's very clear that these agreements are going to be enforced immediately. They were not willing to wait. And the entire point of the FCC's order, Your Honor, is to effectuate this outcome. And I did want to cite... There's one, I think, very helpful site we put in our reply from the Prometheus case in the Third Circuit, where it says the government cannot adopt a policy expressly designed to have a certain effect and then when the policy is challenged in court by those who would be harmed, respond that the policy's consequences are entirely speculative. This is in the financial interests of the cable industry to vindicate their shareholders' rights and interests in this case, and we see no reason to doubt. And I wanted to be sure I was clear that under, for example, the Santa Clara County case, the harm is occurring right now. We cannot plan right now. We cannot do things right now. So it doesn't depend on... Was there any contingency planning based upon the likelihood that you would be in precisely the situation that you're in now? This is a massive change, Your Honor, and I think... But it's a change, again, that has been coming at you since 2007. I mean, you know, barely you escaped it in 2017. I mean, did nobody anticipate that this time might arrive and nobody has made any contingency, you know, for that? I think it's... Certainly folks are trying, but it is an extremely difficult situation, which has led to us asking for this stay, Your Honor, because it's not really possible to do. I think that this would like to just... Isn't the order in effect as of today? It is in effect now, yes. So you're actually asking for a preliminary injunction, are you not? Yes. Yes, but the tests for those are the same, Your Honor. I know my time has long expired, so I wanted to close by saying that we think that this is exactly the kind of situation when a stay is warranted, there is public safety at risk. The complex negotiations that would need to occur in order to implement the order would just have to be redone depending on what Your Honors decide with regard to the FCC's decision. So even if one piece of the order is overturned, then we would have to go and renegotiate all over again because, say, ink heightened is overturned but mixed use is upheld. When you're negotiating, having one piece of the default rules of the road pulled out from under you changes the entire aspect of the negotiation. It seems it would be a waste of resources for all parties concerned, cable industry included. Ms. Lazar, you'll have your four minutes rebuttal. Any further questions at this time? Nope. All right, thank you. Thank you very much. Let's hear from the respondent. Good morning. Thank everyone for getting up early this morning. No, thank you for having us. My name is Maureen Flood. I'm here this morning on behalf of the Federal Communications Commission. I will take 12 minutes. My supporting intervener, Ms. Amundson from NCTA, will take the remaining three minutes. Very well. Thank you. Petitioners who failed to satisfy the four-part test for equitable relief in this court, they haven't demonstrated Speak up a little louder. I'm sorry. Petitioners who failed to satisfy the four-part test for equitable relief in this court, they've failed to demonstrate a substantial likelihood or any likelihood of success on the merits. The commission in the order defined franchise fee or interpreted the definition of franchise fee in the act to cover cable-related in-kind contributions. The commission found support in the broad language of the definition of franchise fee, which defines a franchise fee as any tax fee or assessment of any kind imposed by a franchising authority on a cable operator or a subscriber. This court in Alliance for Community Media in Montgomery County already found that that broad statutory language covers non-monetary in-kind assessments, and so the commission in the order looked at the term franchise fee and found that the broad definition doesn't make any distinctions between cable-related and non-cable-related in-kind contributions. Also in your exchange with counsel for petitioner, the structure of the act or the structure of the franchise fee definition supports our interpretation. Again, there are two exceptions for certain cable-related in-kind contributions, those associated with educational and governmental use, but no other cable-related in-kind contributions are accepted, which necessarily means that all other cable-related contributions fall within the statutory definition. Petitioners talk a lot about the fact that our interpretation of franchise fee would prohibit franchising authorities from performing their duty under Section 546 of the act to assure that in the franchise renewal process, community needs are met. That's not correct. In fact, our interpretation of franchise fee does not require the franchising authority or the municipality to bear the cost of franchise requirements. Cable operators are required to bear the cost of franchise requirements up to the 5% statutory cap on franchise fees. That's a significant amount of money. How much is that, say, for New York City? Well, in NCTA's opposition, they point out that in 2018, New York City collected $127 million in franchise fees. So that gives New York City $127 million to assess in either a franchise fee or in-kind contributions. But again, our interpretation does not prohibit the franchising authorities from imposing those requirements. It does not force them to bear the requirements or the cost of those requirements up to the franchise fee cap. What the act does is Congress provided franchising authorities a generous 5% franchise fee, and it allows them the discretion to take the fee, to apply that fee to requirements such as INETs or public educational and governmental use or free cable service. But it imposes a budget. They have to set their priorities. It does not impose on the cable operator to bear the cost of any requirement that could meet community needs. What is your response specifically to Ms. Lienz's point that 546A says that the franchising authority may, it's permissive, it's not mandatory by the term of the act, may commence this study where they identify cable-related community needs and interests, with the implication being apparently that the costs related to those needs and interests should not count against the cap. What would you say specifically to that? Our response is that we can harmoniously interpret that provision with our franchise fee interpretation. The franchising authority certainly can go into the franchising renewal process and determine whether or not if they exercise their discretion under Section 611 to impose INET requirements or PEG requirements or even to require free cable service to schools and libraries, whether or not that meets community needs. And the cable operator will bear the cost of those requirements up to the 5% franchise fee cap. But if the cable operator is required to bear the cost of each and every requirement that meets community needs, it renders the franchise fee cap in Section 622B superfluous. Again, you can read both 622 and you can read the franchise fee provision and the community needs assessment provision together harmoniously if you understand that the cable operator has to bear costs up to the cap. And that does not in any way prohibit the franchising authorities from imposing franchise requirements. As NCTA points out again, New York City is collecting $127 million in franchise fees each year. That's a significant amount of money. Do we have any idea how much cost would be attributed to things like INET or PEG? Let's say INET, like for New York City or for any jurisdiction where we have an overall franchise fee number. I mean, if that INET cost started to count towards that 5%, do we have any sense of, just out of curiosity really, of what that would look like? Well, sure. Just as a threshold matter, this might be of interest to the Court. NCTA put an ex parte in the record on March 21, 2019, that shows that out of all franchises, approximately 5% of franchises even include an INET. Now, going to your specific question, Your Honor, there is no evidence in the record, and this actually goes to petitioners' failure to demonstrate irreparable harm. They're arguing that our interpretation of franchise fee will make it impossible for them to cover the cost of their INETs. But if you look at the Hawaii Declaration, for example, in paragraph 14, Hawaii says currently carriers, including cable providers, do not sell the type of INET service we get in Hawaii. They offer connectivity priced by the amount of data usage, which is significantly more expensive. So they're looking at a product in the marketplace, but they're not telling us how much it costs. Also, neither New York City nor Hawaii tell us how much they collect in franchise fees each year. So I can't answer your question, Your Honor, because the petitioners haven't put anything in the record to determine whether or not our franchise fee interpretation will cause them irreparable harm. We, in the first instance, need to know how much they're collecting in franchise fees, and then secondly have an estimate of how much they think their INETs would cost. Now, I understand their point that they don't know at this point what the fair market value of their INET will be, but two responses to that. If they don't know what their fair market value is, then what is their basis for coming in and saying that if they have to go out into the marketplace, the fair market value of what they will have to purchase would be greater than the amount of their franchise fee? And the fact that they can point something in the marketplace at least probably gives them some idea of what fair market value will be. Secondly, the commission set forth guidelines in paragraph 62 of the order on review, and those guidelines realize that in some instances there would be a need to renegotiate franchise terms to comport with the order. And to avoid upheaval, the commission told cable operators and franchise authorities that they have to engage in negotiations, and they need to negotiate for a reasonable period of time. The commission said in most instances that will be 120 days, but in most instances, not in all instances, it's a guideline, not a deadline. So, for example, if you have a very large, complicated INET like the one in New York City, it's probably going to take more time to renegotiate franchise terms. Would the commission do anything if, in your view, the cable provider was not allowing a reasonable time in a particular jurisdiction? Yes, so as we pointed out in the order on reconsideration, it's paragraph 5 and footnote 20, and this is the order that we released in response to NCTA's. Okay. Right, so in paragraph 5 and footnote 20. Of that order. Of that order. Okay. What we said was if negotiations between a cable operator and a franchise authority reach impasse, there's not a meeting of the minds. The same remedies that existed prior to the order on reviews are still available to franchising authorities and the cable operator. So when there was an impasse in negotiations before we released the order on review, there were primarily two options. One of the parties could go to court or another party could come to the commission. So our order says you have to negotiate for a reasonable period of time. If a franchising authority felt that the cable operator was being intractable or pushing things too quickly, they could come to the commission and the commission could interpret what reasonable means in that context. So there are two remedies. Again, remedies that were available to them prior to this order that they can take advantage of. I forgot to make one point, Your Honor, going back to this negotiation process. The commission in the stay-denial order and then it reiterated in the order on reconsideration. The cable operator has to reach out to the franchising authority before it can amend the terms of its franchise. And then the commission anticipates negotiations. I'm sorry. My brain's just trying to keep up. Sorry. I'm sorry. I'm talking too quickly. That's all right. It's the cable. Can you just repeat that last sentence? Yes. I'm sorry, Your Honor. That's all right. You don't have to apologize. I'm energetic this morning. Good for you. The guidelines that the commission set out in the order and then clarified in the stay-denial order and reiterated in the order on reconsideration set up a process that works like this. If the cable operator wants to renegotiate terms in its franchise to comport with the order, it is the cable operator's duty to initiate that process. Which I imagine they did with alacrity. No, they haven't, actually. Really? Yes. As petitioners concede in their reply, no cable operator has approached a franchising authority yet to renegotiate terms. But none of them have kind of said, okay, I don't want to have to keep providing some of these things for free because it's going to be over the 5% and I want to shut it down. They haven't said that? They haven't said that at all. And for the process to work, for renegotiation to work, Your Honor, the cable operator has to contact the franchising authority. Sure. The cable operator will propose a fair market value rate. The parties then have a reasonable period of time to negotiate that rate. So if the franchising authority thinks that fair market value is set too high, they can engage in negotiations. And also, Judge Kucinich, I'm going to go back to something you said. How realistic is it that a cable operator would shut down the INET in New York City? There was no evidence in the record that any cable operator has ever shut down an INET or had any intention to do so. There was no evidence in the record that cable operators would unilaterally engage in self-help. And as you pointed out, it doesn't make sense. Cable operators and franchising authorities live under multi-year franchise agreements. To do something as toxic as that would poison the relationship between the two parties and also would affect the cable operator's ability to get a new franchise at franchise renewal time. So there's a whole process put in place to avoid the upheaval that franchising authorities are speculating will happen and are the basis of its irreparable harm claim. And just real quick, if I may, in the process you just outlined, if the parties have this negotiation, they do reach an impasse as to the fair market value of particular services that now, in your view, would count towards the cap. So what happens in the event of that impasse? Somebody comes to you? Well, somebody can come to us or they can go to court. Right. It's the same remedy. What would, like in your view of the act as interpreted in the order, what would they say in court? You're fighting about fair market value. What would we have to say about that? Well, they would go to court and they would have an argument over what the fair market value is. So they would go to court and there would be a trial. I mean, this happens and we cite. The argument isn't whether they have to pay, it's how much they have to pay. That's exactly right. It's a much better way of putting it. Contract fangers. Right. But what would you do if they came to you and they're having this fight? They would file a petition for declaratory ruling with the commission and they would ask the commission to provide clarity over what the fair market value is of a certain product. I think more likely they would go to court. I draw again the court's attention to footnote 20 in the order on reconsideration. It includes, it cites a case concerning a franchise fee between parties over how much they have to pay under a franchise agreement. Okay. I see that I'm over time. I don't want to take a lot of time on this, but I want to go back to the question Judge Kethledge asked you quite a bit ago. I was looking through your brief at the same time he was asking the question as to what your response is to the section 546 argument. All I could find in the brief on page 19 is just one sentence that says, that argument lacks merit because sections 623 and 626 require an accounting of the cost of the franchise requirements that do not, not being italicized, an accounting of the cost of the franchise requirements that do not count towards the franchise fee caps. Then it goes on and gives a couple examples. So is that phrase on page 19 the whole of your answer? No, it's not, Your Honor. We were limited for space. I would draw the court's attention, the answer I gave about the community needs assessment, the more fulsome answer can be found in paragraph 21 of the order on review. The point in our brief about the cost, the fact that it considers both types of costs, responds to petitioner's argument and petitioner's motion. They said that our interpretation of franchise fee renders the cost assessment in 546 superfluous because we wouldn't consider a cable operator's costs at all. And so when we in our opposition, Your Honor, were saying, well, no, in fact it considers other types of costs, we were responding to the argument in their stay motion. When I came up to the lectern today, I was responding to petitioner's argument, which they're presenting to the court today, that our interpretive franchise fee renders the means assessment in the same statutory provision superfluous. My response that I gave to you, there's not a general violation because that response can also be found in paragraph 21 of the order. I hope that helps. Ms. Flood, you're out of time, but I'll give you a minute or two to summarize the FCC's position. Thank you very much, Your Honor. Our position is that our interpretation of franchise fee is based on the text of the statute and the structure of the statute. And even if petitioners could demonstrate irreparable harm, which they can't, they are not entitled to equitable relief because they cannot demonstrate any likelihood of success on the merits. With respect to their irreparable harm claims, as we pointed out, petitioners, in the first instance, haven't demonstrated that they will, in fact, face irreparable harm because they haven't demonstrated that the franchise fees they collect today will not cover the value of in-kind contributions like INS. I'd also point out their lack of urgency in coming to the court. The rules took effect on September 26 of 2019. They've been in effect since September 26, and they didn't go to the Ninth Circuit and file their request for a stay until November 25 of 2019, and they have yet to explain their lack of urgency, which really undercuts their argument that they will face imminent harm that requires equitable relief in this case. I would just summarize by asking the court to... They failed to document their harm. They failed to document their harm, but also their delay... They're asking us to speculate as to the harm. That's exactly right, Your Honor. Just in conclusion, I would ask the court to deny their request for a stay. All right, any further questions? All right, thank you. Thank you, Your Honors. Counsel? Good morning. Good morning, Your Honors. Thank you. Jessica Amundson for Intervenor Respondent, NCTA. Your Honors, we echo the position that Ms. Flood put forth for the FCC on the likelihood of success on the merits, and I'd like to just briefly address the petitioner's failure to show any imminent or likely irreparable harm. To Judge Ketfledge's question, there is nothing in the record that anyone is threatening to shut down the IMETS in New York City or in Hawaii or anywhere else. And as Your Honor's question indicated, that would not probably be a very good idea for cable operators to do. So just to sort of spell out exactly what would happen in this situation, the process that the FCC put forward is that the cable operator must first go to the LFA with the fair market value of the cable-related in-kind services that they are providing. The LFA should, in most instances, be well able to cover the cost of those cable-related in-kind services from the 5% franchise fee that they are getting. Well, what do you mean by that? I mean, I presume, given that you all are fighting about this new order, that they're already charging the full 5%, and so that they're going to have to take on some costs themselves that currently you're paying for. Right, Your Honor. So they are, in fact, in most cases, charging the 5% as monetary and then asking for in-kind services, free services, IMETS on top of that. Okay. But they're getting 5%. So they're just going to have to start paying, in your view, for the fair market value of things that now count in the Commission's interpretation towards the franchise fee. Exactly, Your Honor. So right now the cable operators are writing them, in most cases, a check for 5% and then also providing in-kind services on top of that. And here they simply have to apply some of that check to cover the cost of the in-kind services that they're receiving. So the cable operator comes forward and says, all right, this stuff is now part of the fee, and here's what we think the fair market value of this particular service is. They think that number is crazy, hypothetically, let's say. So what happens then? Well, so then the FCC has set forth that there's a process of negotiation that they say in most places should take 120 days. If you get to the end of the 120 days and there's an impasse, then, as Ms. Blood said, either party can go to court, either party can go to the Commission. So the same rights and remedies that were available under the franchise to begin with remain in effect. That part of the order was not taken out on the motion for reconsideration decision? No, that part of the order was actually reiterated on the reconsideration decision. So it's your representation to this Court that your members would not just sort of unilaterally say, well, then we're just not going to provide it anymore. Well, Your Honor, I think that it would certainly not, if they get to the end of that process. I mean, before even going to the Commission or going to court, just say, all right, fine, get back to us when you're ready to pay this. We're not going to court. We're going to cut you off. Well, if our members were to say that, then they would know that the franchising authority would take them to court for doing that. So they're making a calculation that the same rights and remedies that would be available in the franchise agreement before would remain available. So in terms of the speculative nature of the irreparable harm that petitioners have alleged, they have said that they are facing sort of the loss of services. But what I'm saying is that there is still a process at which if an LFA in New York or Hawaii is facing a cable operator saying, we're actually going to cut off your services, then that LFA could then go to court and seek an injunction against the operator for doing that. So there's certainly no likely or imminent harm happening now. And the petitioners have failed to put any evidence in the record to show that anything like that is happening or that there's any intent of that happening. So just briefly, I see my time has expired, but just briefly if I could just address the renewal provision. And I just want to say that in doing that community needs assessment, it's important to remember that what the LFA is also looking at is the cable operator's ability to provide just the basic service. So even things that don't count toward the franchise fee, but the construction and operation of the cable system itself is also included in that community needs and assessment. So there's certainly a way to read those provisions harmoniously, as Ms. Flood said. Any further questions? Nope. All right. Ms. Arnn, you've got four minutes for rebuttal. Thank you very much. Your Honors, I wanted to start with Section 546 and make clear because Judge Kepledge was noting that and the initial wording of 546 that says the local authority may conduct renewal or may conduct the local needs assessment, but that is actually required when the cable operator requests it, and the cable operator is going to request it because the cable operator cannot avail itself of the review provisions under the statute if it doesn't make that request and the process doesn't go forward. So although it says may, it says shall later down in the paragraph, and as a factual matter, those occur all the time because otherwise cable operator's interests are not protected, so those do occur. Thank you. What is very important is the FCC has acknowledged that it has no evidence about the fair market value of these services, which we noted in our renewal. I mean, sorry, as we noted in our motion. As a practical matter, this stops local franchise authorities from doing something that is much more cost effective and is explicitly covered by the Act. As we explained as the declarations show very clearly, for example, the fiber that Ms. Flood referred to in Hawaii, that is an extremely cost effective way for local governments and cable operators to work together to provide services at much less expense to the taxpayer. The FCC has no evidence whatsoever about what the fair market value of these services are. It's your obligation to show the hardship, not their burden. Absolutely. Well, it was the FCC's burden when it decided that fair market value was the right way to consider these costs rather than cost. Well, if they do count, what value would you propose other than fair market value? Well, sometimes the FCC imposes cost as opposed to fair market value. And what there's... This doesn't go to... I mean, that's an interpretive question, not a hardship one. I think Judge Griffin makes the point, it's your burden to show hardship, so it's your burden to come forward with some evidence that, hey, this is going to, I guess, I don't know, be so expensive that we're going to have terrible consequences. And we don't seem to have any speculation even about what the number might be. I'm sorry, Your Honor, but we did. The declarations which are uncontested, both Hawaii and New York City, say that it would cost millions and millions of dollars, far beyond any budget allocation they already have for Internet services. And because the FCC is valuing these in a completely different way than they have been in the past. So they have explained very clearly that it's many, many more multiples, and I believe it's the Pastora Declaration in paragraph 31 and the Colon Declaration, I think that's 17, talks about the extreme costs that the local government would have to incur. And the FCC assumes that they can just either pay for it, which they can't. So as a practical matter, this answer is not in line with the facts on the ground. And then, in addition, I'm sorry. I guess what confuses me throughout this argument is if we do look at this question of whether the local authorities can or cannot bear this additional cost, that's a policy question. How does that go to the question of the interpretation of the Act? Because the Act gives to local franchise authorities the obligation and the responsibility to manage their local cable-related needs and interests. The Act says you may impose a fee. That fee historically is rent. And the Act very clearly in the statute says you may impose a 5% fee and you can also impose capital costs for PEG, and you can also impose incidental fees, and you can also impose generally applicable taxes. That's what the franchise fee provision says. It doesn't say that, but you're reading it that way. I respectfully disagree with that, Your Honor. I mean, it doesn't say you can also, you can also. I mean, you're sort of putting it that way. No, but that's what 6.522 says. It says you may impose a franchise fee, except, and the practical implication of that is the franchise fee is capped. Because, I mean, Your Honor, they would not contest that the capital costs of PEG are permitted in addition to the franchise fee. That is not at all contested in the facts here. So that is what it means. In other words, the capital costs do not count towards the fee. Correct. Yeah, and they're very careful to carve that out in their order. Correct. But what I'm saying is that the purpose of the exceptions is to allow additional collections to be made, not to impose additional. But you're complaining about things that are not among those exceptions counting towards the fee, correct? Yes, yes. And I did want to just draw one more focus on the act and the distinction, because the FCC tries to use this analysis, but then it can't even comply with its own analysis. And that goes with what we explained in our motion with regard to institutional networks and cable system build-out. Well, that's because one thing is mandated and the other isn't, I think would be their answer. No, Your Honor. That's not what? Build-out is mandated. It's mandated, at least impliedly, by the red line provision, anti-red line. Correct. The local franchise authority is correct, but so is also mandated the ability to ask for an institutional network. No, you may. It doesn't say you must. They must. If I recall, that's one of the provisions that says the franchisor may require, as a condition of the franchise, a certain thing. It's up to you. And so it's not a mandated provision under the act itself. It's something, it would seem, that Congress has left to the discretion of the local franchising authority as to whether that's part, at least as they read the act, part of what you want to count towards your 5%. You don't have to. But if you do and they don't do it, they don't agree to that, then it's a reasonable rejection for purposes of the, you know, you can't unreasonably reject the franchise. Your Honor, that theory is not in the FCC's decision, unfortunately. It might be a way to distinguish these things. But the FCC went through three different ways to try to distinguish cable build-out and INETs, and it couldn't do it, and it couldn't do it this time as well. Well, we'll look at that. Thank you very much, Your Honor. Any further questions? All right. The case is submitted. I want to thank counsel for your argument, also for showing up early.